NEW HAVEN SAVINGS BANK *v.* WEST HAVEN
SOUND DEVELOPMENT ET AL.
(10639)

PETERS, PARSKEY, SHEA, GRILLO and DALY, Js.

Argued February 9—decision released May 10, 1983

*Charles A. Sherwood,* for the appellants (defendants).

*Judy A. Rabkin,* for the appellee (plaintiff).

GRILLO, J. This appeal from a deficiency judgment rendered subsequent to a judgment of strict foreclosure attacks the methods employed by the trial court in its valuation of the subject real estate.

The relevant facts are not in dispute. On November 19, 1973, the defendants[1] executed in favor of the plaintiff a promissory note in the principal amount of $1,100,000, with interest payable at the rate of 9 percent during the first year and, thereafter, at the rate of $8\frac{1}{2}$ percent per annum. As security, the defendants mortgaged to the plaintiff their real property known as "Phyllis', Inc.," a restaurant located on the shore in West Haven. The note described the security interest as including all "apparatus, fixtures, furniture, furnishings and equipment now hereafter attached to or used or procured for use in connection with the operation or maintenance of any such building."

The plaintiff instituted mortgage foreclosure proceedings against the defendants on November 24, 1976.

---

[1] The defendants include the named corporate defendant, Stephen Iovanna, Jr., and Arthur Iovanna.

A judgment of strict foreclosure was rendered on April 15, 1977, and the amount of the debt was established at $1,201,401.66 as of February 25, 1977.[2] The named defendant's law day was set as May 5, 1977, requiring it to redeem $1,201,401.66 plus interest thereon from February 25, 1977. At the expiration of the final redemption date, title to the property vested in the plaintiff on May 16, 1977.[3]

Anticipating a deficiency judgment, the plaintiff filed a motion for appointment of appraisers on April 15, 1977. See General Statutes (Rev. to 1979) § 49-14. The trial court appointed three appraisers on April 22, 1977, and after physical examination of the property on May 16, 1977, the appraisers duly filed their report dated May 23, 1977, wherein they valued the subject realty at $600,000.

On September 14, 1977, the plaintiff filed a motion for deficiency judgment. An objection to the motion was filed by the defendants on February 8, 1979,[4] relying on a decision by this court declaring General Statutes § 49-14 unconstitutional. *Society for Savings* v. *Chestnut Estates, Inc.*, 176 Conn. 563, 576, 409 A.2d 1020 (1979). Subsequently, the plaintiff, relying on the present version of General Statutes § 49-14 enacted by the legislature in 1979, filed a second motion for deficiency judgment on October 3, 1979.[5] A hearing was held

---

[2] The debt was calculated as follows: balance of principal, $1,068,406.96; accrued interest, $116,040.87; taxes due the city of West Haven, $9981.31; interest thereon at 6 percent, $73.20; accrued late charges, $6899.32.

[3] In addition to the named defendant's law day, several subsequent law days were established for other defendants in the mortgage foreclosure action who claimed various liens upon the subject realty.

[4] In light of the record before us it is unclear why the trial court did not act on the plaintiff's motion for deficiency judgment.

[5] The current version of § 49-14, as enacted by Public Acts 1979, No. 79-110, states in pertinent part:

"DEFICIENCY JUDGMENT. (a) At any time within thirty days after the time limited for redemption has expired, any party to a mortgage foreclosure

before *Hon. A. Frederick Mignone,* state trial referee, sitting as the trial court. After hearing the parties' respective evidence, the court rendered a deficiency judgment in favor of the plaintiff in the amount of $294,097.82. From this judgment the defendants appealed and the plaintiff cross appealed to this court.[6]

The relevant evidence introduced before the trial court is as follows: The defendant Stephen Iovanna, Jr., testified that during the first two years of the note the restaurant did quite well financially. During the third year, however, the defendants found it difficult to meet their loan payments due to a drop in business occasioned by economic recession. As a result, the restaurant was listed for sale in September, 1976.

---

may file a motion seeking a deficiency judgment. Such motion shall be placed on the short calendar for an evidentiary hearing. Such hearing shall be held not less than fifteen days following the filing of the motion, except as the court may otherwise order. At such hearing the court shall hear the evidence, establish a valuation for the mortgaged property and shall render judgment for the plaintiff for the difference, if any, between such valuation and the plaintiff's claim. The plaintiff in any further action upon the debt, note or obligation, shall recover only the amount of such judgment.

\* \* \*

"(c) Any party to a mortgage foreclosure who has moved for an appraisal of property for the purpose of obtaining a deficiency judgment, but has not been granted a deficiency judgment, or has not received full satisfaction of any deficiency judgment obtained subsequent to the filing of such motion, may make a motion to the court for a deficiency judgment as set forth in subsection (a) of this section. If such motion is made on or before November 1, 1979, such moving party shall be deemed to have complied with all of the requirements of subsection (a) of this section and shall be entitled to the benefit of any deficiency judgment rendered pursuant to said subsection (a)."

Pursuant to the savings provision contained in subsection (c), the plaintiff timely filed its second motion for deficiency judgment.

[6] In argument the plaintiff, in response to a hypothetical question, acknowledged its willingness to drop its cross appeal should this court find no error on the defendants' appeal. In view of our disposition of this appeal, therefore, we will not consider the plaintiff's cross appeal.

The defendants' real estate broker testified that extensive advertising and marketing campaigns were undertaken in an effort to sell the property. As a result, prior to the defendants' law day in the underlying mortgage foreclosure action, an interested buyer was found. Extensive negotiations followed, culminating in an offer by the prospective buyer, contingent on approval by the bank, to assume with certain modifications the defendants' mortgage. The plaintiff countered with an offer by letter dated April 28, 1977.[7] Despite agreement on several material items, this sale was never consummated. A dispute arose between the defendants and the prospective buyer concerning who would pay the real estate commission, and there were no further negotiations between these parties.

After the plaintiff took title to the subject real estate, marketing efforts continued. In July of 1977, the same buyer who had failed to consummate the earlier sale with the defendants contacted the plaintiff in an effort to purchase the property directly from the bank. Negotiations followed, culminating in a sale of the restaurant in November, 1977. The buyers agreed to assume the outstanding mortgage (then $1,178,808) under the following conditions: (1) during the first three months, the note bore no interest and no payments were due; (2) during the next nine months, payments were limited to 6 percent of gross sales, payable at the end of the nine month period, but in no event was payment to exceed 4½ percent of the principal amount of the note; (3) beginning with the second year, monthly payments were to consist of interest only at the rate of 6 percent; (4) commencing in the third year, monthly

---

[7] The plaintiff agreed to allow the prospective buyer to assume the defendants' mortgage with, inter alia, the following modifications: interest only, at the rate of 6 percent, payable monthly for the first two years; the buyer would be personally liable only to the extent of $100,000, the defendants remaining liable for the balance.

payments of principal and interest were to be at the rate of 8½ percent. Additionally, the buyers' joint and several liability was limited to $60,000, the buyers were required to invest $80,000 toward renovation, and the plaintiff paid the entire real estate commission.

In addition to testimony and exhibits concerning the November, 1977 sale, the opinions of five expert witnesses addressing the value of the subject realty were offered into evidence. Robert Parente, Donald Nitz and Albert Franke, the three appraisers appointed by the trial court in April, 1977, testified that in their opinion the value of Phyllis' in the spring of 1977 was $600,000. Each appraiser reached this amount by relying primarily on the income approach to valuation.[8] Under this approach, the net rental value per square foot of the subject property is determined through a comparison of rentals of other similarly situated properties. This figure is then multiplied by the square foot area of the real estate to produce an annual net rental figure. Next a capitalization rate, the rate a reasonable investor

---

[8] Each appraiser testified that there are three basic methods of arriving at the fair market value of property: the cost approach, the market data approach and the income approach. The cost approach estimates the cost to reproduce the building as it exists, minus applicable depreciation, plus the value of the land. The appraisers rejected this approach under the circumstances because in their opinion the restaurant was over improved and did not represent the highest and best use of the real property.

The market data approach compares recent sales of similar type properties located in the same general area with the subject real estate, with due regard given to differences, in order to reach a valuation figure. Although the appraisers utilized market data in order to verify their conclusions under the income approach, they were reluctant to rely too heavily on comparable sales because of the absence of truly comparable properties upon which to base their comparisons.

would seek on his capital or equity, is established. By dividing the annual net rental figure by the capitalization rate, market value is ascertained.[9]

Parente, Nitz and Franke all testified that they were aware of the November, 1977 sale of the subject realty. In their opinion, however, because of the unusual financing terms the sales price was not an accurate reflection of market value. Accordingly, each continued to adhere to the $600,000 valuation figure. Nitz testified that if the sales price were adjusted to reflect the favorable financing arrangement, the cash equivalent of the sales price would fall between $700,000 and $770,000.

The plaintiff further introduced into evidence a report of Durocher Associates, which had appraised Phyllis' for purposes of the foreclosure action. In its appraisal of the subject real estate, Durocher Associates utilized all three methods of valuation: the cost approach, the income approach and the direct sales comparison (market data) approach. In its opinion the market value of the realty, as of January 25, 1977, was $648,000.

---

[9] The appraisers reached the $600,000 figure as follows: comparisons of similarly situated properties produced an annual net rental figure (the figure paid by a lessee who pays all maintenance costs, including taxes, insurance and utilities) of between $5.00 and $5.50 per square foot. The capitalization rate, which is a composite figure based upon prevailing market conditions, was found to be 10.5 percent, or .105. Multiplying $5.00 by 12,000, the square footage of Phyllis' utilized by these three appraisers, produced an annual net rental income figure of $60,000. $60,000 divided by .105 produces a value of $572,000. Multiplying $5.50 by 12,000 produces an annual net rental income figure of $66,000. $66,000 divided by .105 produces a value of $629,000. Averaging $572,000 and $629,000, these three appraisers arrived at a market value of $600,000.

The $600,000 figure was subsequently verified by using the market data approach. Dividing $600,000 by the square footage of Phyllis', 12,000, produced a market value of $50 per square foot. Comparing this figure with recent sales of other restaurants, the appraisers concluded that $600,000 was a reasonable figure.

The defendants produced as an expert witness Norman Benedict, who testified that in his opinion the value of the subject realty as of September, 1977 was $1,200,000. In reaching his conclusion, Benedict relied primarily on the income approach to valuation. To reach a rental value per square foot, however, Benedict did not compare rentals of similarly situated properties, instead relying on past income and expense statements from both the subject realty and other restaurants in order to reach the rental figure the property could command. Moreover, Benedict utilized a 10 percent capitalization rate, found the square footage of Phyllis' to be 12,500, and further included as rental space the basement of Phyllis', which the plaintiff's appraisers had construed as unusable space. Because of these differences, Benedict's appraisal value was double that of the plaintiff's appraisers.[10]

In light of this record, it is clear that the trial court was confronted with conflicting expert opinion testimony concerning valuation of the subject property. The trial court could reasonably conclude that its valuation efforts were further muddied by the sale of the realty six months after foreclosure at a price inflated by atypical financing arrangements.

The trial court, in a comprehensive memorandum of decision, weighed and balanced the diverse evidence presented. It concluded that due consideration should be given to the November, 1977 sale as one indicator of the property's market value. With regard to the

---

[10] Benedict reached a valuation figure of $1,200,000 as follows: Upon reaching a rental figure, based upon projected income, of $11.67 and $4.38 for the main floor and basement of Phyllis', respectively, he multiplied these figures by the square footage of the respective areas to attain an annual gross rental income figure of $166,469. When expenses were subtracted, a net rental income of $118,814 remained. By dividing this figure by a capitalization rate of 10 percent, Benedict reached a valuation figure of $1,188,140, which he rounded off to $1,200,000.

appraisal testimony, it determined that the income approach, which was primarily relied upon by all appraisers, was the most feasible approach to utilize in arriving at a valuation of the subject property. Weighing the conflicting evidence concerning this approach, the court concluded that, given all the evidence presented, a deficiency judgment of $294,079.82 was warranted under the circumstances.[11]

Although the defendants' brief purports to address a plethora of issues on appeal, their arguments may be effectively reduced to one: Whether the trial court erred in utilizing the income approach to valuation where the subject realty was sold six months after foreclosure.[12] Under the circumstances of this case, we find this claim unpersuasive.

---

[11] The trial court reached its decision as follows: It first determined that the useable square footage of the subject property totaled 12,500 in the main level area and 3000 in the unimproved basement area. The court thereafter assigned, respectively, $7.50 and $2.50 as the fair net rental value per square foot of these areas. Multiplying the total square foootage of each area by its respective value and adding the sums, the court arrived at an annual net rental figure of $100,750. Applying a capitalization rate of 10.5 percent, the court reached a fair market value for the subject property of $959,524, which it rounded off to $960,000.

From the fair market value of $960,000 as of May 16, 1977, the court deducted unpaid taxes of $23,939.44, which had accrued prior to that date, as a prior claim against the property. See *Hartford Federal Savings & Loan Assn.* v. *Lenczyk,* 153 Conn. 457, 461–62, 217 A.2d 694 (1966). Accordingly, the appraisal value was reduced to $936,060.56. Deducting this amount from the amount of the mortgage debt, $1,230,158.38, the trial court rendered a deficiency judgment in favor of the plaintiff in the amount of $294,079.82.

[12] The defendants briefed the additional claim that the plaintiff failed to file its initial motion for deficiency judgment within the ninety day time period required by General Statutes § 49-14 as it existed in 1977. In argument, however, the defendants admitted that in presenting this claim they inadvertently overlooked the last sentence of § 49-14, which excludes July and August from consideration in calculating the ninety day period and therefore rendered the plaintiff's initial motion for deficiency judgment timely. General Statutes (Rev. to 1979) § 49-14.

We note, first, that the statutory changes effected by Public Acts 1979, No. 79-110 and occasioned by this court's decision in *Society for Savings* v. *Chestnut Estates, Inc.*, supra, significantly change the role of the trial court in the valuation process. Prior to 1979, the report of the court-appointed appraisers was "final and conclusive as to the value of such mortgaged property." General Statutes (Rev. to 1979) § 49-14. "[T]he power of the court to review the question of value [was] limited to questions of law." *Buck* v. *Morris Park, Inc.*, 153 Conn. 290, 293, 216 A.2d 187 (1965), appeal dismissed, 385 U.S. 2, 87 S. Ct. 33, 17 L. Ed. 2d 2 (1966). Under the present version of § 49-14, however, the issue of valuation is determined by the trial court. It is therefore appropriate to consider other contexts wherein the trial court is empowered to determine valuation.

In the context of a real property tax assessment procedure, we stated that "in determining value, the trier is under a legal compulsion to consider everything that might legitimately affect value." *Uniroyal, Inc.* v. *Board of Tax Review*, 174 Conn. 380, 390, 389 A.2d 734 (1978). In an appeal from the acquisition of property by eminent domain, we concluded that "[u]ltimately, the determination of the value of the land depended on the considered judgment of the referee, taking into account the divergent opinions expressed by the witnesses and the claims advanced by the parties." *Bennett* v. *New Haven Redevelopment Agency*, 148 Conn. 513, 516, 172 A.2d 612 (1961).

In determining valuation pursuant to § 49-14, the trier, as in other areas of the law, is "not bound by the opinion of the expert witnesses . . . ." *Birgel* v. *Heintz*, 163 Conn. 23, 30, 301 A.2d 249 (1972). The referee could have rejected the appraisers' testimony "in whole or in part regardless of [his] belief or non-belief of the subordinate facts relating to [their

opinions]." *Fox* v. *Mason,* 189 Conn. 484, 489, 456 A.2d 1196 (1983). "The evaluation of testimony is the sole province of the trier of fact. We do not retry the case. The conclusion of the trial court must stand unless there was an error of law or a legal or logical inconsistency with the facts found." (Citations omitted.) *Maresca* v. *Allen,* 181 Conn. 521, 523, 436 A.2d 14 (1980). We will disturb the trial court's determination of valuation, therefore, only when it appears on the record before us that the court "misapplied or overlooked, or gave a wrong or improper effect to, any test or consideration which it was [its] duty to regard." *Bennett* v. *New Haven Redevelopment Agency,* supra.

In the present case the trial court employed the income method of valuation, the approach primarily relied upon by all of the appraisers, including the defendants' witness. Our review of the reasoning and figures utilized by the court reveals that in determining valuation it accepted and rejected portions of each appraiser's testimony in an effort to reach a compromise between the conflicting evidence presented. Under the circumstances of this case such an approach, which was clearly an effort to give due regard to all circumstances, was reasonable.

We further reject the defendants' contention that there was "no evidence" upon which the court could have reached its valuation figure. When confronted with conflicting evidence as to valuation, the trier may properly conclude that under all the circumstances a compromise figure most accurately reflects fair market value. See *Bennett* v. *New Haven Redevelopment Agency,* supra, 515–16.

With regard to the November, 1977 sale, the trial court specifically noted its rejection of the $600,000 figure arrived at by the plaintiff's appraisers because

of their failure to consider the sale as "some indication of market value." While it is true that a recent sale of the subject realty resulting from " 'fair negotiations between a desirous buyer and a willing seller, neither under any undue compulsion to make a deal'; *New Haven Water Co.* v. *Board of Tax Review,* 166 Conn. 232, 236, 348 A.2d 641 [1974]"; *Uniroyal, Inc.* v. *Board of Tax Review,* supra; will ordinarily be the most reliable indicator of fair market value, the particular facts of this case remove it from this general rule. The extremely favorable financing obtained by the buyer, and his limited liability, combine to warrant the conclusion that, contrary to the defendants' argument, the price did not fully reflect the consideration exchanged in the transaction. Indeed, the buyer testified that he would not have consummated the sale if the transaction reflected the prevailing market conditions concerning down payments and interest rates. Under these circumstances, the trial court was justified in construing the sale as one indicator, among many, of the property's fair market value.

Finally, the defendants assert that the trial court erred in failing to consider the value of personal property within the restaurant, which was a component of the mortgage debt, in its determination of fair market value. With respect to this issue, the court specifically stated that the note described the plaintiff's security interest as including all fixtures and personal property within the premises. Our review of the record before us, however, reveals that it is barren of any evidence concerning the value of such personalty. While it is true that the province of the trier extends to a determination of the weight and sufficiency to assign evidence, the trier may not decide an issue which is wholly un-

supported by the evidence.[13] *Novak* v. *Anderson,* 178 Conn. 506, 508, 423 A.2d 147 (1979).

There is no error.

In this opinion the other judges concurred.

---

[13] We reject the defendants' contention that the trial court erred in computing of the debt due the plaintiff and deducting for taxes; see footnote 10, supra; without evidence therefor. The trial court obtained these figures by referring to the earlier mortgage foreclosure judgment. At no time during the foreclosure proceedings, by process of appeal, or during the hearing on the plaintiff's motion for deficiency judgment did the defendants contest the accuracy of these figures. The trial court was entitled to rely upon the previous mortgage foreclosure judgment in its determination of the debt due the plaintiff. See *Fox* v. *Schaeffer,* 131 Conn. 439, 447–48, 41 A.2d 46 (1944).