WEST HAVEN SOUND DEVELOPMENT CORPORATION *v.*
CITY OF WEST HAVEN
(12624)

PETERS, C. J., SHEA, DANNEHY, CALLAHAN and NOVACK, Js.

---

Argued May 7—decision released August 26, 1986

*Irving H. Perlmutter,* with whom were *Gary P. Sklaver, Louis Smith Votto,* corporation counsel, and, on the brief, *Jonathan J. Einhorn,* former corporation counsel, for the appellant (defendant).

*Charles A. Sherwood,* with whom was *Joseph R. Mirrione,* for the appellee (plaintiff).

DANNEHY, J. The plaintiff, West Haven Sound Development Corporation, brought this action against the defendant, city of West Haven, to recover damages for an alleged breach of contract. A jury found for the

plaintiff and awarded damages of $3,100,000. The defendant appealed from the judgment rendered on the verdict.

The parties to this appeal have been involved in litigation for more than eleven years. The facts leading up to the alleged breach have been clearly and adequately set forth in the cases of *West Haven* v. *Impact*, 174 Conn. 160, 384 A.2d 353 (1978), and *New Haven Savings Bank* v. *West Haven Sound Development*, 190 Conn. 60, 459 A.2d 999 (1983). We will, therefore, limit ourselves to a brief discussion of the facts relevant to the defendant's claims on appeal.

The jury could reasonably have found that the plaintiff, then doing business under the name of Phyllis', the defendant, and the West Haven Redevelopment Agency entered into a contract early in 1973. Under the terms of the contract, the defendant conveyed to the plaintiff a parcel of land by a deed containing the condition that the land be used in accordance with the defendant's urban renewal plan (the plan) for the Savin Rock area of West Haven. The plan, which was also incorporated by reference into the contract, provided that a substantial portion of the land in the Savin Rock area would be developed for commercial, recreational and apartment use. The parties to the contract expressly agreed that there could be no modification of the plan affecting the rights of the redevelopers without their consent. The plaintiff constructed a restaurant facility on its parcel, at a cost of approximately $1,700,000. The restaurant opened for business in December, 1973.

On October 17, 1974, a referendum initiated by a civic organization called Impact was passed by the voters of West Haven. The referendum required the city to reverse its course and turn the remaining undeveloped Savin Rock property into a public park. The West

Haven redevelopment agency then informed all of the existing redevelopers of the referendum and sought their consent to the proposed "modification" of the plan. The plaintiff was one of several redevelopers who withheld consent. Unsure of how next to proceed, the city of West Haven sought a declaratory judgment to determine whether the referendum in fact constituted a modification of the plan within the meaning of General Statutes § 8-136.[1] The trial court concluded that the referendum was not a modification of the original plan and that the city could enforce it without the redevelopers' approval. On appeal to this court that decision was reversed. See *West Haven* v. *Impact,* supra.

Between the passage of the referendum and our decision in *Impact,* redevelopment in the Savin Rock area was at a standstill. In May, 1977, the plaintiff's business closed. The plaintiff then filed this action, alleging that its business had failed because the defendant had breached its contract with the plaintiff by modifying the original redevelopment plan. At trial, the jury found for the plaintiff and awarded damages of $3,100,000. The defendant subsequently moved to set aside the verdict, and for judgment notwithstanding the verdict. The motions were denied.

On appeal, the defendant claims that the trial court erred: (1) in failing to find that the city of West Haven was not the proper defendant; (2) in failing to find that the defendant was excused from fulfilling its contrac-

[1] General Statutes § 8-136 provides: "A redevelopment plan may be modified at any time by the redevelopment agency, provided, if modified after the lease or sale of real property in the redevelopment project area, the modification must be consented to by the redeveloper or redevelopers of such real property or his successor or their successors in interest affected by the proposed modification. Where the proposed modification will substantially change the redevelopment plan as previously approved by the legislative body, the modification must similarly be approved by the legislative body."

tual obligations under the doctrine of impossibility of performance; (3) in not setting aside the verdict as excessive; and (4) in allowing certain expert testimony regarding the value of the plaintiff's business. We affirm the trial court's ruling with respect to the defendant's liability under the contract; we find error, however, on the issue of damages and remand that issue for further proceedings.

## I

### LIABILITY

The defendant's first contention is that the trial court should have found as a matter of law that the city of West Haven was not liable for any failure to implement the plan. The defendant's contention is premised on the notion that the redevelopment agency, created through a state enabling statute; see General Statutes § 8-126;[2] is an agency of the state, and that under the urban renewal statutes in chapter 130, responsibility for redevelopment rests with the agency. From this premise it argues that any failure to implement the plan should be viewed solely as a breach by the redevelopment agency, an entity which the defendant claims is separate and distinct from the city of West Haven.

The defendant's argument fails for several reasons. First, the city of West Haven was a separate party to the contract itself, and thus even if the redevelopment agency were to be considered a state agency, the town could still be held liable for breach of contract as a principal obligor. In addition, the fact that the West Haven

---

[2] General Statutes § 8-126 provides in part: "The legislative body of any municipality may designate as a redevelopment agency the housing authority of the municipality or the state commissioner of housing or other appropriate state agency, or may create a new redevelopment agency to consist of electors resident therein. The members of any redevelopment agency so created shall be appointed by the chief executive of a city or borough or by the board of selectmen of a town with the approval of the legislative body."

redevelopment agency was created in accordance with a state enabling statute does not necessarily make it an agency of the state. General Statutes § 8-126 authorizes municipalities to create a redevelopment agency, but unlike local boards of education which are considered state agencies; see *Fowler* v. *Enfield,* 138 Conn. 521, 86 A.2d 662 (1952); the creation of a redevelopment agency is not mandated. In addition, language throughout chapter 130 speaks of a "municipality, acting by and through its redevelopment agency." See General Statutes §§ 8-134, 8-135. Finally, while redevelopment agencies are granted broad powers under chapter 130 to propose and implement redevelopment plans; see General Statutes §§ 8-127, 8-128, 8-137; ultimate authority to approve a plan, to make substantial modifications in such a plan, and to approve land disposition agreements under a plan remains with the municipality. See General Statutes §§ 8-127, 8-136, 8-137.

The jury heard evidence that the West Haven redevelopment agency was created by the city of West Haven and that its members were appointed by city officials. The jury had before it the contract for the sale of the land to the plaintiff. The parties to the contract were "the West Haven Redevelopment Agency, *an agency of the City of West Haven, Connecticut . . .* the City of West Haven . . . and The Phyllis's Incorporated." (Emphasis added.) The deed of conveyance specifically refers to the West Haven redevelopment agency as "an agency of the City of West Haven, Connecticut, not being a distinct and separate corporate entity." Extensive evidence was also presented regarding the respective duties of the agency and the city in proposing, approving, implementing and modifying a plan of redevelopment.[3] From all of the evidence pre-

[3] For example, upon cross-examination of the plaintiff's expert, Professor Janice Griffith, the following colloquy took place:

sented, it would have been reasonable for the jury to have found that the relationship between the defendant and the redevelopment agency was one of agency, and that the defendant was liable for the breach of contract.

Ordinarily, the question of agency is one of fact to be determined by the trier of fact. *Cohen* v. *Meola,* 184 Conn. 218, 220, 439 A.2d 966 (1981); *Botticello* v. *Stefanovicz,* 177 Conn. 22, 26, 411 A.2d 16 (1979); *Cleaveland* v. *Gabriel,* 149 Conn. 388, 394–95, 180 A.2d 749 (1962). In this case, however, the trial court effectively removed that issue from the jury's consideration by directing the jury to find that the West Haven redevelopment agency was an agent of the city of West

"Q. Professor Griffith, you indicated I believe that the Redevelopment Agency is the one that performs the functions of redevelopment on behalf of a city?

"A. Yes.

"Q. Are you aware of who is a defendant in this case?

"A. The City of West Haven.

"Q. Are you aware that the New Haven, or the West Haven Redevelopment is not a defendant?

"A. I believe I am aware of that, yes.

"Q. And—

"A. I have not looked directly at the caption, but in terms of my impression of the entire case, yes, it is against the City of West Haven.

"Q. And the Redevelopment Agency is the one who is obligated to perform the various functions with regard to redevelopment.

"A. Not all of the functions. The statute does provide for the City to approve the plan and to take other action. But the Redevelopment Agency is the agency which undertakes the specific redevelopment function.

\* \* \*

"Q. Did I understand your testimony to be that the City Council by statute has a vote in this redevelopment procedure also?

"A. The specific statute, but my recollection is that the legislative body of the City of West Haven must approve the redevelopment plan and if there is any substantial modification to the plan they must also approve it.

"Q. And must they not also approve any deeds or any land disposition agreements?

"Mr. Sherwood: If you know.

"A. I would know. I would have to look at the statute, but my recollection is, yes, they would have to."

Haven. The trial court instructed the jury that "the plaintiff has made certain allegations in its complaint which have been responded to by the defendant in the answer. These allegations made by the plaintiff are not disputed because they have been admitted by the defendant." The court then went on to identify the specific allegations in the complaint which had been admitted by the defendant. Among those were "the *allegations of paragraph four to the effect that the plaintiff's previously existing restaurant facility was taken by the defendant, demolished, and that the plan as adopted by the defendant through its agent,* the West Haven Redevelopment Agency, did set forth the manner and fashion that said redevelopment of Savin Rock Urban Renewal Project was to proceed, and especially the type and nature of the development contemplated thereby." (Emphasis added.) The court then instructed the jury that these allegations were "admitted by the defendant's answer and are therefore binding upon the defendant and relieve the plaintiff from the necessity of proving the facts as alleged."

The trial court's charge was correct. "Factual allegations contained in pleadings upon which the cause is tried are considered judicial admissions and hence irrefutable as long as they remain in the case." *Dreier* v. *Upjohn Co.,* 196 Conn. 242, 248, 492 A.2d 164 (1985); *Griffin* v. *Nationwide Moving & Storage Co.,* 187 Conn. 405, 406 n.1, 446 A.2d 799 (1982); *Rodearmel* v. *Rodearmel,* 173 Conn. 273, 275, 377 A.2d 260 (1977); *Lutkus* v. *Kelly,* 170 Conn. 252, 257, 365 A.2d 816 (1976); *Jones Destruction, Inc.* v. *Upjohn,* 161 Conn. 191, 199, 286 A.2d 308 (1971); see Tait & LaPlante, Connecticut Evidence (1976) § 6.7 (a). The defendant admitted agency in its answer, and at no time during the trial of this case did it seek to have its admission " 'withdrawn, explained or modified.' " *Dreier* v. *Upjohn Co.,* supra, 249 n.2. Moreover, the defendant

did not except to this, or any other portion of the trial court's charge. The trial court did not err in failing to find "as a matter of law" that the city of West Haven was not liable on the contract.

The defendant's second contention is that the court erred in failing to find as a matter of law that performance of the contract had been rendered impossible by the passage of the referendum and by the subsequent trial court decision that the referendum did not effect a modification of the plan. The concepts of impossibility or impracticability of performance have been recognized in various decisions of this court; see *Grenier* v. *Compratt Construction Co.,* 189 Conn. 144, 454 A.2d 1289 (1983); *Hess* v. *Dumouchel Paper Co.,* 154 Conn. 343, 225 A.2d 797 (1966); in the Restatement (Second) of Contracts, §§ 261 through 272, and in various legal treatises. See 6 Corbin, Contracts §§ 1320 through 1372; 18 Williston, Contracts (3d Ed. Jaeger) §§ 1931 through 1979. Section 261 of the Restatement (Second) of Contracts provides: "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." A "governmental regulation or order" which makes performance of a duty impracticable "is an event the non-occurrence of which was a basic assumption on which the contract was made." 2 Restatement (Second), supra, § 264.

The defendant's position is that it should be excused from performing its contractual obligations because the passage of the referendum and the trial court ruling were "governmental orders" which rendered its performance impossible. The defendant recognizes that for a party successfully to utilize the "impracticability by act of law" defense, that party must not be at fault in

the sense of having created or contributed to that impracticability. 2 Restatement (Second), supra, §§ 261, 264, comment a; 17 Am. Jur. 2d § 418. Arguing that it had no power to curtail the actions of the group sponsoring the referendum and no authority to rule on the legality of the referendum, the defendant contends that it was not "at fault" for the impossibility that resulted. We perceive this argument as fundamentally flawed because it artificially separates the city of West Haven and the administrators who act on its behalf from the individuals who comprise the electorate.

Under § 1 of the charter of the city of West Haven, "the inhabitants dwelling in the territorial limits of the Town of West Haven . . . shall be a body politic and corporate under the name of the City of West Haven." The municipality as an entity represents the interests of its inhabitants. *Keating* v. *Patterson*, 132 Conn. 210, 213 n.1, 43 A.2d 659 (1945). The West Haven charter also delineates the powers of the mayor and the city councilpersons who act on behalf of the citizens of West Haven. In signing the contract at issue in this appeal, the mayor, acting in his official capacity, bound the city to sell the parcel of land to the plaintiff and to observe all of the contractual obligations involving the Savin Rock redevelopment plan. When such obligations were unfulfilled, it was the city that was sued.

The charter also gives the people of West Haven the right to propose ordinances to the city council and if an ordinance is not passed by the council, the people may approve the ordinance by a majority of votes. The referendum at issue in this case was proposed by a group of West Haven citizens belonging to an organization called "Impact" and was approved by the majority of West Haven voters. The parties agree that upon its passage, the Impact referendum automatically became a city ordinance, and that the city council could not have refused to enact it. An ordinance is a legisla-

tive enactment of a municipality; *Aaron* v. *Conservation Commission,* 183 Conn. 532, 537, 441 A.2d 30 (1981); *Duplin* v. *Shiels, Inc.,* 165 Conn. 396, 398, 334 A.2d 896 (1973); and the fact that this ordinance was sponsored by popular referendum does not mean that it was not a legislative enactment by the municipality. The Impact referendum can only be viewed as the action of the city of West Haven, the same entity which, through its elected and appointed representatives, had entered into the contract with the plaintiff. The city should not be allowed to escape its contractual obligations by a vote of its citizens that rendered performance of the contract impossible.

The Maine Supreme Court faced a similar issue in *Elsemore* v. *Hancock,* 137 Me. 243, 18 A.2d 692 (1941). There, the plaintiff had contracted with the defendant town to teach in its public high school. When the inhabitants of the town voted to close the school, the court held that the doctrine of impossibility did not relieve the town of liability for breach of the teaching contract. The court explained, "[a]ssuming authority to be vested in the voters of a town to discontinue a free high school at will, where no contract rights are involved, we do not believe it should be permitted, as one of the parties to a valid contract, to avoid its contractual obligations by such roundabout action." Id., 250. Like the town in *Elsemore,* the city of West Haven should not be allowed to utilize the impossibility defense when it was itself responsible for the referendum, the action that created the impossibility. "To hold otherwise would be to overlook reality and the facts in the case." *West Haven* v. *Impact,* supra, 165.

## II

### DAMAGES

As previously stated, the jury returned a general verdict in favor of the plaintiff in the amount of $3,100,000.

The defendant challenges the damage award on the grounds that: (1) there was insufficient evidence that the breach of contract was the cause of the plaintiff's loss; (2) the trial court erred in allowing Ronald Jordan, the plaintiff's expert witness, to testify to the value of the plaintiff's restaurant business at the time of the breach; and (3) the plaintiff failed to prove the amount of its damages with the degree of certainty required by law. Although we do not agree precisely with the claims as presented by the defendant, we nonetheless remand this case for a redetermination of damages.

We first address the defendant's claim that there was insufficient evidence that the breach of contract caused the failure of the plaintiff's restaurant business. Causation was a question of fact for the jury to determine. We must presume that the jury by its general verdict found the issue of causation in favor of the plaintiff. *Sanderson* v. *Steve Snyder Enterprises, Inc.,* 196 Conn. 134, 142 n.5, 491 A.2d 389 (1985); *Matthews* v. *F.M.C. Corporation,* 190 Conn. 700, 706, 462 A.2d 376 (1983). The plaintiff in this case presented evidence that by 1974 there were at least seven developers in the Savin Rock area of West Haven. The jury could reasonably have concluded that these individuals would have proceeded with redevelopment, but for the defendant's breach of contract. The jury could further have determined that the surrounding development would have revitalized the entire area, resulting in increased patronage of the plaintiff's restaurant. We believe that the evidence was sufficient to support the jury's determination that the breach of contract caused the plaintiff to suffer damages in this case.

The defendant also claims that the trial court erred in allowing Jordan, a certified public accountant, to testify to the value that the plaintiff's restaurant would have had had the defendant not breached its contract to permit redevelopment of the Savin Rock area. On

the basis of certain econometric projections as to future revenues and costs, Jordan predicted the profits that the restaurant would likely have earned had redevelopment of the area proceeded as originally contemplated by the contracting parties. Jordan then computed the net present value of these future earnings, using a rate of capitalization appropriate to the restaurant business, to arrive at a valuation of the plaintiff's restaurant in 1974 at the time of the breach. Jordan testified that in his opinion the capitalized value of the plaintiff's projected earnings was $1,900,000 at the time of the breach.

The defendant contends that Jordan should not have been allowed to value the plaintiff's restaurant on the basis of econometric predictions of future revenues and costs because actual data was available which showed that the restaurant had operated at a loss in 1974 and 1975. The defendant argues that Jordan's projections as to the restaurant's profitability were faulty being contradicted by the actual profit record in 1974 and 1975. It is undisputed that the plaintiff's restaurant lost $76,831.53 in 1974 and $70,151.79 in 1975. The defendant thus concludes that Jordan should not have been allowed to testify to his opinion as to the restaurant's value, because that opinion was based on his allegedly faulty profit projections.

The trial court did not err in allowing Jordan to testify to the restaurant's value based on the economic situation as it reasonably appeared before the breach of contract. The plaintiff opened its restaurant in December, 1973. The parties have stipulated that the breach occurred, if at all, on October 17, 1974, the date of the referendum precluding further development of the Savin Rock area. The restaurant eventually closed its doors in May, 1977. Jordan testified as to what he believed the business would have earned, and what it would have been worth, had the breach not occurred.

The fact that the restaurant actually operated at a loss after the breach is certainly not fatal to Jordan's prediction of what might have occurred had the contract been performed. See *Turgeon* v. *Turgeon,* 190 Conn. 269, 273, 460 A.2d 1260 (1983). We can agree with the defendant that the actual profit data was a relevant consideration against which Jordan might have checked the accuracy of his projections. This was a proper subject of cross-examination, and the defendant in fact questioned Jordan in detail as to whether he had evaluated the actual data. We do not believe, however, that Jordan should have been precluded from using econometric projections to predict future profits merely because those projections were contradicted by the restaurant's actual profit performance after the breach.

The defendant also argues that Jordan should not have been permitted to give his opinion as to the restaurant's value because that opinion was based on the existence of future profits which, the defendant contends, were speculative and uncertain to occur. The plaintiff had operated its business in the Savin Rock area since 1945, beginning with a hot dog stand. As its business improved, the plaintiff built an addition to its establishment, and later moved into a larger facility. In 1961, the plaintiff built a new, larger restaurant, where the enterprise continued to grow and prosper. The plaintiff in 1970 unsuccessfully resisted the condemnation of its establishment pursuant to the defendant's plan of redevelopment. Thus, when the plaintiff built its new restaurant in 1973, it was not without a sustained history of profitable operation in the Savin Rock area.

The plaintiff does not appear to have sought to recover damages for "lost profits" as such from the defendant's breach of contract. Rather, the plaintiff theorized that it had been forced to go out of business by the defendant's breach, and thus, that it was entitled

to recover the *value of its business* as damages for breach of contract. Consequently, the plaintiff sought to establish the "going concern" value of its restaurant, instead of its "book" or "net asset" value, as the appropriate measure of compensation for what it had lost. The plaintiff therefore produced Jordan to testify to the going concern value of its business at the time of the breach. As it happens, however, Jordan determined the value of the plaintiff's business by estimating future profits, and then by capitalizing those expected profits to their net present value at an appropriate interest rate. Thus, although the plaintiff may not technically have attempted to recover its lost future earnings, i.e., its lost profits, it is clear that Jordan's "value" figure of $1,900,000 is nothing more than his computation of expected future earnings capitalized to their present value in 1974. Since Jordan's opinion as to the restaurant's "going concern" value was directly based upon his econometric projections of lost profits, we may facilitate our review of the defendant's claim of error by treating it as though it were a straight challenge to the plaintiff's recovery of lost profits for breach of contract.

"The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed." *Beckman* v. *Jalich Homes, Inc.,* 190 Conn. 299, 309, 460 A.2d 488 (1983); *Lar-Rob Bus Corporation* v. *Fairfield,* 170 Conn. 397, 404–405, 365 A.2d 1086 (1976); *Bachman* v. *Fortuna,* 145 Conn. 191, 194, 141 A.2d 477 (1958). It has traditionally been held that a party may recover "general" contract damages for any loss that "may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself." *Hadley* v. *Baxendale,* 9 Ex. 341, 354, 156 Eng.

Rep. 145 (1854); see Farnsworth, Contracts (1982) § 12.14, p. 874 n.5; McCormick, Damages (1935) § 138, pp. 564–65; Dobbs, Remedies (1973) § 12.3, p. 804; 3 Restatement (Second), supra, § 351 (2) (a); see also *Heyman* v. *CBS, Inc.,* 178 Conn. 215, 229–30, 423 A.2d 887 (1979). This court has consistently applied the general damage formula of *Hadley* v. *Baxendale* to the recovery of lost profits for breach of contract, and it is our rule that "[u]nless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach." *Kay Petroleum Corporation* v. *Piergrossi,* 137 Conn. 620, 624, 79 A.2d 829 (1951); *Stern & Co.* v. *International Harvester Co.,* 146 Conn. 42, 45, 147 A.2d 490 (1958), appeal after remand, 148 Conn. 527, 533, 172 A.2d 614 (1961); *Tompkins, Inc.* v. *Bridgeport,* 94 Conn. 659, 685, 110 A. 183 (1920); *Maguire* v. *Kiesel,* 86 Conn. 453, 461, 85 A. 689 (1913).

The plaintiff had operated a profitable restaurant for many years in the Savin Rock area of West Haven. The defendant appears to argue that the prospects of its continued success were speculative and uncertain merely because the plaintiff had recently relocated its business in a different, larger, and more expensive physical structure. This court has never held that a prior profit experience is essential to the recovery of prospective profits for breach of contract. *Gordon* v. *Indusco Management Corporation,* 164 Conn. 262, 274, 320 A.2d 811 (1973). Reasonable certainty of proof is all that is required, and "mere uncertainty as to the amount of lost profits may be dispelled by the same degree of proof as is required in other civil actions, that is, the amount may be determined approximately upon reasonable inferences and estimates." *Burr* v. *Lichtenheim,* 190 Conn. 351, 360, 460 A.2d 1290 (1983); *Bronson & Townsend Co.* v. *Battistoni,* 167 Conn. 321,

326–27, 355 A.2d 299 (1974); *Southern New England Contracting Co.* v. *State,* 165 Conn. 644, 661, 345 A.2d 550 (1974); see 3 Restatement (Second), supra, § 352.

In the present case, Jordan based his profit projections, and hence, his opinion as to the restaurant's value, on standard valuation procedures recognized in the accounting profession. Not only was Jordan a certified public accountant, but he also had been a university professor where he taught both graduate and undergraduate courses in finance and accounting. Moreover, Jordan had co-authored a college textbook on securities analysis and business valuation, the third edition of which had specifically dealt with valuation in the restaurant industry. In *Stern & Co.* v. *International Harvester Co.,* supra, 46–48, we found reversible error in the refusal of the trial court to allow the plaintiff's expert accountant witness to testify to the value of the plaintiff's business allegedly lost as a consequence of the breach of contract. See also *Doeltz* v. *Longshore, Inc.,* 126 Conn. 597, 601, 13 A.2d 505 (1940) ("since the only available evidence as to the value of the goodwill of a business is necessarily the opinion of a qualified witness, evidence of that character is accepted in such cases"). While Jordan's opinion as to the value of the plaintiff's restaurant before the breach was necessarily based on assumptions concerning the level of supportive development by other businesses in the Savin Rock area, Jordan qualified his opinion accordingly, and the jury was correctly instructed that it must reject the expert's opinion if it failed to find the assumed facts to be proven. We find that Jordan's opinion as to the going concern value of the plaintiff's restaurant business before the breach was based on reasonable estimates of lost profits.

We next consider the defendant's related claims that the evidence was insufficient to support the amount of the damage award and that the damages awarded were

excessive. The plaintiff in this case claimed various elements of damage which for convenience of analysis we have grouped into three general categories.[4] The first category is that which we have previously discussed, i.e., compensation for loss of the going concern value of the plaintiff's restaurant business. According to the plaintiff, this element of damage amounted to $1,900,000, computed by Jordan as the net present value in 1974 of the restaurant's projected profits under the assumption that redevelopment in the Savin Rock area would proceed as had been contemplated by the parties. The second category consists of the plaintiff's investment in land, fixtures and in the cost of constructing its new restaurant. The plaintiff presented evidence that the cost of its building was $1,371,476.50, the cost of its land was $119,000, and that the cost of its fixtures and equipment was $226,462.07. The plaintiff's investment in these capital assets was encumbered by a mortgage in the original amount of $1,100,000. The mortgage was foreclosed in 1977, and a deficiency judgment was entered against the plaintiff in the amount of $294,097.82. See *New Haven Savings Bank* v. *West Haven Sound Development,* 190 Conn. 60, 459 A.2d 999 (1983). Subtracting the original principal amount of the mortgage ($1,100,000) from the sum of its capital expenditures and the deficiency judgment ($2,011,036.39), the plaintiff values its loss of capital investment at $911,036.39. The third category of damages may be described as expenses incurred by the

---

[4] The plaintiff itself has not grouped or presented its damages in any organized fashion, and we stress that our categorization of damages is for convenience of analysis only. The same is true with respect to the dollar amounts assigned by us to these categories. While taken from actual figures proffered by the plaintiff in its brief, the values we have assigned to individual categories are, at best, approximations based on the limited information before us. On remand, the plaintiff is free to value and prove its damages, and under whatever theory, as it wishes. In short, the plaintiff on remand is not collaterally estopped by the dollar amounts or theories of recovery discussed in this opinion.

plaintiff after the breach in an attempt to keep its restaurant afloat. This category includes short term bank loans and loans from corporate officers used to meet operating expenses, e.g., payroll, etc., as well as accounts payable to suppliers. The plaintiff values these expenses in the approximate amount of $200,000. By aggregating all of these expenses, and including taxes and accrued interest on its deficiency judgment, the plaintiff claims to have offered evidence of damages in the amount of $3,303,091.20, a figure in excess of the $3,100,000 awarded it by the jury. The plaintiff thus concludes that the evidence was sufficient to sustain the jury's verdict and that the verdict was not excessive.

As previously discussed, Jordan, the plaintiff's expert witness, testified that the going concern value of the plaintiff's restaurant before the breach was $1,900,000. It does not appear, however, that Jordan was ever asked for his opinion of the going concern value of the plaintiff's business *after* the breach. As such, the jury had no evidence from which it might have determined the diminution in value of the plaintiff's business caused by the breach. In this case, the plaintiff's loss consisted of the difference between the value of the business had the contract been performed and the actual value of the business as a result of the breach. *Johnson* v. *Healy,* 176 Conn. 97, 104–107, 405 A.2d 54 (1978); *Gordon* v. *Indusco Management Corporation,* supra, 273. The plaintiff appears to have theorized that since it had been forced to go out of business, its business was worth nothing as a going concern as a result of the breach. Therefore, according to the plaintiff, it was entitled to receive as compensation the full value that its business would have had had the breach not occurred. We disagree.

While the plaintiff's theory might have validity in certain circumstances, we find it inapplicable to the facts of this case in light of the factors considered by Jordan

in determining the going concern value of the plaintiff's business before the breach. Jordan based his opinion as to the restaurant's value on its anticipated potential to earn future profits. As he stated: "What you buy is a stream of earnings. . . . [Y]ou are looking at a future stream and trying to say what is that worth to me today; how much will I pay today for my piece of the action in the future." In conceptualizing the factors which would generate the projected earnings stream, Jordan explained that he was valuing "the right to operate with the name of Phyllis' either at that location or at another location, or perhaps even with the thought of franchising the business and using the recipes and whatever else that they had that was associated with the name Phyllis', as opposed to valuing the common stock of the company; as opposed to valuing the real estate; as opposed to analyzing the personal property. It was really analyzing the business itself as distinct from the real estate and equipment."

It is clear to us that many of the factors considered by Jordan in projecting the plaintiff's future profit stream, and hence, the value of the "business itself" before the breach, were such as *could not have been lost* by the plaintiff in consequence of the breach. For example, assuming that the plaintiff was forced into bankruptcy by the breach, it would nonetheless retain the value of its name, its reputation, its experience in the restaurant business, its recipes, its right to franchise, etc. These quantities, very much the same as goodwill, were valuable assets which underlay, in part, Jordan's opinion as to the value of the business as a going concern. It simply cannot be said that these assets were suddenly rendered valueless merely because the plaintiff was forced to close its doors. On the contrary, these elements of value remained with the plaintiff to be used or not as it chose, e.g., by reopening its business at a new location. Cf. *Laurel, Inc.* v. *Commissioner of*

*Transportation,* 180 Conn. 11, 29, 428 A.2d 789 (1980). While we recognize that the location of a restaurant may be an important component of its value as a going concern, we think that its name, its reputation for good food and quality of service, the expertise of its management, are equally important components of value. Since Jordan had based his determination of value on these factors, he should have been asked to value the plaintiff's business in light of these factors after the breach.[5] Because the plaintiff presented no evidence to establish the value of its business as a result of the breach, there was insufficient evidence to support the jury's finding on damages.

Before concluding our discussion of this category of the plaintiff's damages, it is important to make two final points. The first concerns Jordan's projection

---

[5] It is important to recognize that the plaintiff, by capitalizing its projected earnings, effectively converted those earnings into *property* with a present value, according to the plaintiff, of $1,900,000. This valuable property must be conceptualized as consisting of its component elements, and we think those elements may imperfectly be described as capital and goodwill. This court does not attempt to apportion the relative contributions to earnings between the plaintiff's capital and its goodwill; see 1 Bonbright, Valuation of Property (1937) pp. 242–43; comment, "Valuation of Shares In a Closely Held Corporation," 47 Miss. L.J. 715, 729 (1976); Vass, "Factors That Are Presently Being Emphasized in Valuing a Closely-Held Corporation," 38 J. Tax. 356, 357 (1973); although we note that this—the combined value of its capital and goodwill—is what the plaintiff sought to value, and hence to recover as damages, when it chose to value its loss by capitalizing its projected earnings to a net present value of $1,900,000.

Thus, viewing the plaintiff's capital and goodwill as property, it is clear that the plaintiff placed a value on this property only by valuing, under the capitalization of earnings method, the profit stream that this property would likely have produced. To the extent that any of this property remained, in whatever combination or proportion, *after* the breach, we assume that it retained at least *some* of its capacity to generate income, and therefore, that it must have had *some* value, even after the breach. As we have previously stated, we consider it highly unlikely that the plaintiff lost *all* of its goodwill in consequence of the breach, i.e., the value of its name, etc., and therefore, the plaintiff may be thought to have retained at least some of the income producing potential of its goodwill after the

of the plaintiff's anticipated profits, which as stated, formed the basis of his opinion as to the restaurant's value. It appears from his testimony that in determining the plaintiff's future profits, Jordan did not subtract from projected revenues the salaries of the corporate officers. The plaintiff is a closely held, family-owned corporation. Its owners *were* its corporate officers, who worked at the restaurant and drew salaries. Therefore, the prospective profits of the restaurant, and hence, its value under Jordan's formula, could not properly have been determined without considering the salaries paid to the corporate officers. *Gordon* v. *Indusco Management Corporation,* supra, 275. To the extent that prospective profits were determined without an appropriate deduction from revenues for imputed wages, the

breach. Although we recognize that our assumption would not be valid if it were adequately shown that the breach had thrust the plaintiff into such abject financial condition as to be unable to profitably exploit the value of whatever goodwill may have survived the breach, we do not believe that the diminution in value of the plaintiff's business may adequately be determined without some attempt by the plaintiff to establish the before *and* after values of the business.

In summary, we think that where a plaintiff in a contract action seeks to recover damages for the alleged loss of its business, and where the plaintiff elects to value its business by a method which relies on the capitalization of projected earnings (the capitalization of earnings method and its many variants), the plaintiff must place two values into evidence. The first is the value of the business based on the capitalized value of the profits the business would have earned if not for the breach. The second is the value of the business based on the capitalized value of the profits the business would *reasonably be capable* of producing after the breach. With regard to this latter value, we would note that a business is not necessarily incapable of producing profits merely because it has been forced temporarily to close its doors. The decision to close, like the decision not to reopen, may be based on a number of different factors, personal to the controlling shareholders or directors, not directly related to the economic environment created by the breach of contract. Therefore, we believe that substantive principles of contract recovery as well as the doctrine of avoidable consequences; see Farnsworth, Contracts (1982) § 12.12; require that the after-breach value of the business be determined by capitalizing the profits that the business is reasonably capable of producing, without regard to whether the business has actually reopened its doors. The difference between these two values will reflect the proper measure of recovery.

going concern value of the plaintiff's business before the breach, allegedly $1,900,000, was overstated for the purposes of assessing damages in a contract action. Id., 276.

Secondly, the trial court, over the defendant's objection, allowed the plaintiff to ask Jordan for his opinion as to the value that the plaintiff's restaurant would have had as of the date of trial, July 5, 1984, had it remained in business. Jordan responded that the business would have been worth $2,700,000. The plaintiff in its brief to this court glibly asserts that there is "no indication" that the jury considered this figure in its deliberations. We agree. We would also note, however, there is "no indication" of this or anything else that the jury might have considered in arriving at its $3,100,000 damage award. This unfortunate circumstance comes about, in part, because neither the plaintiff nor the defendant sought to have the jury instructed as to how they were to compute damages in the event that they found a breach of contract. The value that the plaintiff's business might have had in 1984 was irrelevant to the issue of damages in this case. Jordan's opinion as to the value of the restaurant in 1974 was based on his projections of future *profits,* not future *value.* The defendant's objection to Jordan's testimony as to the restaurant's estimated value in 1984 should have been sustained.

We next consider the second category of damages claimed by the plaintiff, i.e., those consisting of its alleged loss of capital investment in land, its building and its fixtures. As previously noted, the plaintiff values its lost investment in capital assets at $911,036.39. The plaintiff claims that it undertook this level of capital investment in reliance on the contract, and that as a consequence of the breach its investment was lost.

We have no difficulty with the basic idea that a party injured by a breach of contract may under certain circumstances recover the cost of his reliance as part of his expectation interest. Dobbs, Remedies (1973) § 12.3, p. 811; Fuller & Perdue, "The Reliance Interest In Contract Damages," 46 Yale L.J. 52, 78–84 (1936). "Based upon the elementary proposition that the measure of damages for a breach of contract is the loss which the injured party has thereby sustained, the rule in its more specific application embraces the two distinct elements of (1) expenditures already incurred 'towards performance,' and (2) 'the profits that he would realize by performing the whole contract.' " *Tompkins, Inc.* v. *Bridgeport,* supra, 682, quoting *United States* v. *Behan,* 110 U.S. 338, 344, 4 S. Ct. 81 (1883); see 3 Restatement (Second), supra, § 344, illustrations 1 and 2. "There is no objection in theory to combining recovery measured by the *reliance interest* with recovery for such lost profits as are proved with sufficient certainty. The problem in practice is to avoid excessive recovery through overlapping items." Farnsworth, supra, § 12.16, p. 891. In the present case, we think that the plaintiff's reliance interest in its capital investment was included in Jordan's valuation of the business as a going concern.

The plaintiff was entitled to recover the full value of what it had lost as a consequence of the breach of contract. As we have previously discussed, the plaintiff described an element of this loss as the value of its business as a going concern. Accordingly, the plaintiff produced Jordan, who valued the plaintiff's business as a going concern at $1,900,000, essentially by projecting a stream of future profits, and then by capitalizing those profits, at an appropriate rate of capitalization, to their net present value. As Jordan clearly indicated in his testimony, the value figure which he derived was intended to represent the amount of money that a buyer

would pay for the right to receive the anticipated income stream. We assume that Jordan's hypothetical buyer would expect to receive for the purchase price of the plaintiff's business not only the income stream, but the capital assets necessary to generate that income stream as well. "In the case of an operating company, the primary consideration in the valuation process . . . is generally considered to be not the net asset value, but rather the earning capacity of the business. . . . In valuing a going concern the 'willing buyer' will place primary emphasis on the earning capability of the assets he is considering buying." Vass, "Factors That Are Presently Being Emphasized in Valuing a Closely-Held Corporation," 38 J. Tax. 356 (1973). 1 Bonbright, Valuation of Property (1937) p. 244; 16 Proof of Facts 2d, Forensic Economics—Valuation of Businesses and Business Losses § 7, p. 271. Therefore, the plaintiff should not be permitted to recover both the capitalized value of its projected earnings *and* the lost value of the capital investment necessary to generate those earnings.

Furthermore, it appears that the plaintiff seeks to recover the diminution in value of its business as measured by two alternative approaches to valuation. While there are several different methods by which to determine the value of a closely-held corporation, these methods, and their variants, are of two general types: (1) capitalization of earnings, or the net present value of a future income stream; and (2) net asset value, or the present sale price of the business assets less its liabilities. *Ronald v. 4-C's Electronic Packaging, Inc.,* 168 Cal. App. 3d 290, 299, 214 Cal. Rptr. 225 (1985); *In re Marriage of Hewitson,* 142 Cal. App. 3d 874, 881–82, 191 Cal. Rptr. 392 (1983); 2 O'Neal, Close Corporations (1958) § 7.24; Lawinger, "Appraising Closely-Held Stock—Valuation Methods and Concepts," 110 Trusts and Estates 816, 817–19 (1971); 2 Proof of Facts 2d,

supra, § 1; see *Uniroyal, Inc.* v. *Board of Tax Review,* 174 Conn. 380, 386, 389 A.2d 734 (1978). While these alternate methods of valuation frequently yield different results; see, e.g., *Turgeon* v. *Turgeon,* 190 Conn. 269, 272–75, 460 A.2d 1260 (1983); they purport at least in theory to obtain the same object, i.e., the market value of the business. That different methods of valuation may yield different results, depending upon what exactly is being valued, does not mean that the results of the alternate methods can simply be summed to determine total value. One or the other, or the combined weighted average of each, will produce the best approximation of market value. Comment, "Valuation of Shares In a Closely Held Corporation," 47 Miss. L.J. 715, 739–41 (1976); 16 Proof of Facts 2d, supra, § 8; Vass, supra, 358; Lawinger, supra, 817.

By claiming damages for the loss of its capital investment, the plaintiff utilizes nothing other than a variant of the net asset approach to the valuation of its business. Clearly, the plaintiff may not recover as damages the sum of the results obtained under alternative approaches to valuation. Since the plaintiff would not be entitled to recover both its loss of capital investment *and* the capitalized value of its projected lost earnings, the jury's verdict of $3,100,000 finds no support in the evidence, and is therefore excessive.

We would add that should the plaintiff on remand elect to recover its loss in capital investment, rather than the capitalized value of its projected lost earnings, it will be incumbent upon the plaintiff to value its investment correctly. The plaintiff presently values the loss of its investment at $911,036.39, a figure it derives by aggregating the acquisition costs of its capital assets, subtracting the amount encumbered by mortgage, and then adding back in the amount of the deficiency judgment. The plaintiff's proffered procedure does not produce the correct measure of contract damages. While

the actual or out-of-pocket cost to the plaintiff of acquiring its capital assets may be evidence of value, the value of that investment at the time of the breach "was not necessarily the amount originally paid for it." *Gordon v. Indusco Management Corporation,* supra, 273. The plaintiff undertook a certain level of capital investment in reliance on what it believed the property would be worth in view of the anticipated redevelopment of the Savin Rock area. It exchanged cash and long term notes for fixed assets. Perhaps the plaintiff paid too much, perhaps too little; but clearly, the value of what it acquired need not have equalled the amount it paid. If the plaintiff made a bad deal, i.e., the value of what it acquired was less than the value of what it paid, then the defendant cannot be held responsible for this amount. In order to determine the diminution in value of the plaintiff's capital investment, should the plaintiff on remand employ this approach, the value—and not merely the acquisition cost—of that investment before the breach will have to be ascertained. We assume that the full value of its investment after the breach has already been determined. *New Haven Savings Bank* v. *West Haven Sound Development,* supra. The difference between these two values, if any, will reflect the correct amount of the plaintiff's loss of investment in capital assets resulting from the breach of contract.

We now turn to the third and final category of damages claimed by the plaintiff. These damages include short-term bank loans, loans from corporate officers and individuals, accounts payable to suppliers, and related costs incurred by the plaintiff in an attempt to meet operating expenses and thus to remain in business after the breach. As noted, the plaintiff values the amount of this loss in the approximate amount of $200,000.

The plaintiff "clearly had a duty to exercise reasonable conduct to minimize the damages occasioned by the defendant's breach; *Brown* v. *Middle Atlantic Transportation Co.,* 131 Conn. 197, 199, 38 A.2d 677 [1944]; see *Camp* v. *Cohn,* 151 Conn. 623, 627, 201 A.2d 187 [1964]; *Eastern Sportswear Co.* v. *S. Augstein & Co.,* 141 Conn. 420, 425, 106 A.2d 476 [1954]; and the court will measure damages as though [it] had acted reasonably. See 22 Am. Jur. 2d, Damages, § 203." *Willametz* v. *Goldfield,* 171 Conn. 622, 627, 370 A.2d 1089 (1976). The logical corollary of this rule is that the plaintiff was entitled to recover the cost of its reasonable efforts to mitigate the damages occasioned by the breach. Farnsworth, supra, § 12.12, pp. 867–68; Dobbs, supra, § 9.2, p. 599. "The injured party is not precluded from recovery . . . to the extent that he has made reasonable but unsuccessful efforts to avoid loss." 3 Restatement (Second), Contracts § 350 (2) and comment h, and § 347, comment c.

Thus, a jury question was presented as to whether the expenses incurred by the plaintiff in an attempt to salvage its business after the breach were reasonable. We have no way of knowing to what extent the jury included these expenses in its award. On remand, the jury should be instructed that the plaintiff may recover only those expenses reasonably incurred in its efforts to mitigate damages occasioned by the breach of contract.

Before leaving this case a final caveat is in order. We have throughout this opinion set forth only standards by which the losses claimed by the plaintiff may be *identified and valued.* We emphasize that all of these losses are not necessarily *compensable* in an action for breach of contract. A significant limitation on the recovery of damages for breach of contract is stated in 3 Restatement (Second) of Contracts, § 351 (1). That section provides that "[d]amages are not recoverable for loss that

the party in breach did not have reason to foresee as a probable result of the breach when the contract was made." See *Neiditz* v. *Morton S. Fine & Associates, Inc.,* 199 Conn. 683, 689 n.3, 508 A.2d 438 (1986). While the question whether a particular element of loss was reasonably foreseeable is a question of fact, we do not see how the jury could properly have considered the foreseeability of those elements of the plaintiff's claim which were never identified, disentangled or explained. Upon proper instruction, the jury might reasonably have awarded the plaintiff some or all of the elements of loss discussed in this opinion. Without such instruction, however, the jurors were left to calculate damages in their largely unbridled discretion. In light of the complexity of this case, on remand the jury should be given detailed guidance by the trial court on the legal doctrines underlying the calculation of damages.

There is error and the case is remanded for further proceedings not inconsistent with this opinion.

In this opinion the other justices concurred.