[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 732
The plaintiff, the Norwich Community Development Corporation, Inc. (NCDC or plaintiff) brought this action against the defendant Nicholas Arbucci (Arbucci or the defendant) for breach of a contract to reconvey a parcel of land on which is located a railroad depot. The defendant City of Norwich was named because it claimed to have an interest of record in the premises by virtue of recorded tax liens for unpaid real estate taxes. The Farmers and Mechanics Bank was admitted as a party defendant because it too claimed an interest in the premises by virtue of judgment liens it had filed against Arbucci. Although both the city and the bank were represented by counsel, they took no part in the trial of the case for reasons that will be readily apparent.
NCDC alleged in its `revised' complaint that it sold to Arbucci on December 30, 1986, real estate in Norwich known as the "Railroad Depot" for a price of $61,000. It further alleged that the transaction was subject to a `land use agreement' which required Arbucci essentially to rehabilitate the depot and to substantially complete the rehabilitation and have the premises ready for tenants within 18 months, and if not, then NCDC would have a right to demand a reconveyance for a price of $56,000. NCDC claims Arbucci did not perform the contract and this suit ensued for a reconveyance of the premises, after it tendered the $56,000 and Arbucci refused to reconvey the premises.
Arbucci filed an answer denying the material allegations of the plaintiff's revised complaint together with a two count counterclaim; the first count alleging that the plaintiff acted in bad faith by impeding portions of the rehabilitation project, and the second count for unjust enrichment in the event a reconveyance of the premises is decreed. The plaintiff denied the material allegations of the counterclaim.
I. CT Page 733
The court, after hearing from eleven witnesses and receiving into evidence a total of eighty exhibits from both parties, finds the following facts. The plaintiff, NCDC, is a nonstock corporation formed to foster development in the City of Norwich and to participate in the rehabilitation of downtown Norwich. NCDC purchased the Providence and Worcester railroad depot and adjacent land for the sum of $250,000, which sum was contributed in part by the city, in part by the Norwich Parking Commission, and in part from its own sources.
NCDC sought developers to rehabilitate the railroad depot and selected the defendant. Thereupon, the parties entered in a real estate contract, Plaintiff's Exhibit B,[1]
and pursuant to the contract, the plaintiff delivered a warranty deed to the depot together with some land around it to the defendant and obtained a parking use agreement so that the premises would have additional parking, for a total price of $61,000. The issues critical to this case stem from the land use agreement, Plaintiff's Exhibit C, which was the central part of the transaction.
The land use agreement provides in pertinent and relevant part:
 "2. . . (c) within eighteen (18) months from December 31, 1986, Developer (Arbucci) will have substantially completed all rehabilitation and premises will be ready for tenants. . . .
 3. In the event of Developer's failure to satisfy any of the conditions subsequent as described in paragraph 2 above, Owner [NCDC] may repurchase the premises for a purchase (sic) which shall be the lesser of $56,000, or the then fair market value of the premises and improvements. In the event of a default or breach of the conditions provided in paragraph 2 by Developer and the failure by Owner to demand a reconveyance by December 31, 1989, CT Page 734 then the right of Owner for reconveyance hereto shall terminate. . . .
 5. In the event of a default by Developer of any of the conditions set forth in paragraph 2 above, and the failure of Developer to reconvey said premises pursuant to the terms of paragraph 3 above, Owner shall have the right to commence an action in equity seeking a reconveyance and if Owner secures a final judgment ordering a reconveyance of said premises, Owner shall be entitled to reasonable attorney's fees incurred in bringing said action."
 II.
Both the real estate contract and the land use agreement were negotiated by the parties and each were represented by counsel throughout. Common sense ordinary meanings must be given to the words and phrases used in the agreement. In this case, the court concludes that the land use agreement was really a specialized form of building contract. The court notes that the defendant was required to perform by June 30, 1988, but experienced difficulties, and the plaintiff granted him a six-month extension. After a meeting in December 1988, attended by defendant's counsel, the plaintiff's representatives informed the defendant that he was in breach and requested that the defendant advise them of what work he planned to do to complete the renovation and in what time frame. When neither the defendant or his attorney responded to the request for this information, this lawsuit ensued.
The building, when purchased by the defendant, was dilapidated, indeed a blight, and needed a considerable amount of reconstruction to both its exterior and interior. The defendant had also obtained a "facade grant" which obligated him to do the exterior brickwork and windows in compliance with certain plans and specifications which were prepared by an architect and approved by the plaintiff and the Norwich Office of Economic Development. See Plaintiff's CT Page 735 Exhibit R.
The plaintiff's expert witness, Gordon Hyde, a licensed architect, inspected the building on November 1, 1990 and May 5, 1992. He compared the condition of the building with the construction plans. He found that on the north face, none of the window wood sash was completed, that there were defects in the window glazing, that some window arches were not in conformity with the plans and that many of the windows were not properly installed on the east face. He also found that the building was not properly secured and that the principal access door was not installed. On the south side, he found that the brick arches were not reconstructed, that "double hung" windows were not installed as required and that many windows needed replacement or repairs. He opined that on the south side virtually all of the work called for still needed to be done to comply with the facade plans.
On the westerly side, he found that with respect to the extension, it needed to be cleaned, scraped and repainted to match, and that none of the required work was done.
Hyde concluded that the exterior work was not substantially completed.
With respect to the interior, he found it generally unfinished. There was no provision for the handicapped lift, and although there was some electrical wiring, ductwork and plumbing installed, none was completed. No toilets or sinks, associated rough plumbing, or other amenities were installed in the restrooms called for in the plans. He also found that the stairs installed did not comply with the code, and part of the ceiling and sheetrocking was incomplete. He noted that the sprinkler system required approval by the fire marshal and no such approval was obtained. He concluded that, in his opinion, the work was not substantially completed, and that the premises were not ready for tenants. He further opined that with a substantial crew of good craftsmen, it would take several months to complete the job in accord with the plan.
Richard Sharpe, a licensed architect, testified for the defendant. He had been retained by the Providence and Worcester railroad to do restoration plans in 1982 and to CT Page 736 document the existing building and the then extent of damage, was familiar with the building, and provided plans and assistance to the defendant. Unfortunately, he was not retained by the defendant to supervise and monitor the work as it progressed, but only to provide the plans and shepherd the plans through the various bureaucratic approval processes, which he did.
He inspected the building, however, on several occasions after the defendant began his work, once in an attempt to assist the defendant to either comply with the facade plan or seek a modification or waiver. This attempt was unsuccessful. It was his opinion that all of the windows installed by the defendant had to be replaced, including the sash and trim because it was not done in compliance with the plan and that this would cost between $800 to $1,000 per window for a total of $36,000. On cross examination, he revealed that he had been in the building on several occasions, the last on October 5, 1992, the day before this trial began. He found the building incomplete, and that there was wiring, piping and ductwork left to do. He stated further that there was no space provided for the wheelchair lift, and on cross examination, that in his opinion, the job was not substantially completed.
As the court has deemed the agreement between the parties to be a form of building contract, the court concludes that the rules for determining whether the defendant has breached the contract should be similar to those used in building contracts, and the question is: Did the defendant substantially perform?
"Whether a building contract has been substantially performed is ordinarily a question of fact for the trier to determine." Nor'easter Group, Inc. v. Colossale Concrete, Inc., 207 Conn. 468, 472 (1988). The analysis necessarily involves an inquiry into the totality of facts and circumstances surrounding the performance of the contract. Miller v. Bourgoin, 28 Conn. App. 491, 496 (1992), cert. den.223 Conn. 927 (1992). The pertinent factors to consider are those expressed in Vincenzi v. Cerro, 186 Conn. 612, 616
(1982), where the court said in discussing whether a builder who is guilty of a "wilful" breach could recover:
"The contemporary view, however, is that even a CT Page 737 conscious and intentional departure from the contract specifications will not necessarily defeat recovery, but may be considered as one of the several factors involved in deciding whether there has been full performance . . . The pertinent inquiry is not simply whether the breach was "wilful," but whether the behavior of the party in default comports with standards of good faith and fair dealing . . . Even an adverse conclusion on this point is not decisive but is to be weighed with other factors, such as the extent to which the owner will be deprived of a reasonably expected benefit and the extent to which the builder may suffer forfeiture in deciding whether there has been substantial performance." (internal quotation marks and citations omitted.) See Restatement (Second), Contracts 237 and 241. In addition to the factors in 241, Restatement Contracts (Second) as applicable to this case, the court also considers the extent of nonperformance of the contract as a whole, which was originally estimated to take six to seven months and cost $180,000 as a whole, the cost of completion, the time required for completion, the quality of the work actually done, and the purposes and ends the performance was expected to serve. See Corbin, Contracts 705. "Substantial performance contemplates the performance of all items of a building contract except for minor details, those easily remedied by minor expenditures." Argentinis v. Gould,23 Conn. App. 9, 14 (1990), (overruled on other grounds)219 Conn. 151 (1991). It is clear from the evidence, and the court so finds, that the central purpose of the contract was to insure completion of the depot in a timely manner so that it could be used for commercial purposes and assist in rejuvenating the downtown Norwich area. The work unperformed and deficiencies that require correction to conform to the plans are not minimal, especially when the court credits the testimony of both architects that approximately three months of work and the expenditure of in excess of $36,000 (for the windows alone) would be needed to do so. None of the evidence preferred by the defendant credibly contradicts the plaintiff's evidence, and the court therefore finds that the defendant failed to have "substantially completed all rehabilitation [so that the] premises will be ready for use by tenants." The court therefore finds that the defendant is in breach of the contract.
III. CT Page 738
The court views the plaintiff's claim pursuant to the provision in the land use agreement calling for reconveyance as akin to an action for specific performance. It is necessary, therefore, to set forth some of the principles to be applied in determining whether a reconveyance should be ordered in this case.
"The availability of specific performance is not a matter of right, but depends upon an evaluation of equitable considerations. . . . The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court." Allen v. Nissley, 184 Conn. 539, 546 (1981) (internal citations omitted).
"Applications for specific performance of an agreement to sell land are addressed to the discretion of the court which must determine upon the facts and under the circumstances whether the contract is fair, reasonable, on good consideration, free from fraud, surprise or mistake and made according to the requirements of the law." Nann v. Pignatelli, 3 Conn. App. 74, 78 (1984), cert. den., 196 Conn. 805
(1985). In this case, there was no evidence that the contract was unfair or unreasonable, or fraudulent or without good consideration. Nor was there any credible evidence of surprise or mistake or that the contract was not made in accordance with legal requirements.
The defendant, in fact, had inspected the premises often, enlisted the services of an architect, was represented by counsel throughout, and was able to condition his purchase of the property on his ability to obtain a mortgage in the amount of $140,000, which he waived.
"As a general rule, equity, in deciding whether to grant specific performance in enforcing a contract, will consider the fairness of an agreement in accordance with the circumstances as they existed at the time of the execution of the contract even though the property contracted to be sold becomes considerably more valuable at the time performance is due." Nann v. Pignatelli, supra, 78-79, citing Robert Lawrence Associates, Inc. v. DelVecchio, 178 Conn. 1, 18-19
(1979) (specific performance granted although lot substantially increased in value at time of trial). CT Page 739
"Specific performance of a contract will not be refused because there has been an increase in the value of the property contracted for between the date of the contract and the time when execution is demanded where (1) the parties anticipated such an increase due to a change in zone to commercial so as to develop a shopping center and where (2) the contract at the time it was made was a reasonable and fair one." Robert Lawrence Associates, Inc., supra, 19. See also Kahalik v. Bernardo, 184 Conn. 386 (1981) (specific performance decreed even where substantial inflationary impact on property value during the time between breach and trial).
The defendant asserts that he expended approximately $180,000 on the renovation and that he offered evidence of value through an appraiser that the property in 1989 was worth $389,000. He further buttresses this claim of enhanced value by his own opinion that the premises are presently worth $500,000, and that, at a very minimum, when he was forced to accept an offer to sell the premises at less than fair market value because of financial straits, and after this suit commenced, the premises are worth no less than $250,000. See Defendant's Exhibit 20. (sales agreement dated June 14, 1989).
He therefore essentially argues that since the value of the premises was enhanced largely by dint of his own efforts, then a decree of specific performance would be harsh and inequitable, would be tantamount to a penalty or forfeiture, and would be a windfall to the plaintiff.
As to these claims, the court finds these additional facts.
First, although the defendant estimated he spent "approximately $180,000" on the job, he introduced only $156,524.82 in checks as evidence of this claim. Even a cursory analysis of these checks reveals that many were at most indirectly related to the job, such as checks for truck expense, tires for the defendant's truck, insurance, leasehold improvements, tools and the like. Many others were for utilities and the phone bills for his home, as he had no office; but they were not properly presented as overhead components. Many of the other checks were made to cash, and were used for defendant's own living expenses. Also, many of CT Page 740 the items purchased by the defendant were for use in the restaurant he planned and added no benefit to the real estate and many others were for fixtures such as the railings which he removed and are no longer on the property. From a close examination of the checks, the court concludes that, including payment to the defendant for his own labor, he expended approximately $110,000, plus some unreimbursed labor on the real estate renovation job. The court does not find credible the defendant's opinion as to value. The court notes that the defendant testified that he based his opinion of value in large part on Defendant's Exhibit 54. That exhibit which is a feasibility and planning study for an ice skating rink facility in the central business district on several parcels of land, including the depot, contains a land acquisition and demolition estimate and states that the "full market" value of the defendant's property was $93,286 as of 1988 and as of 1992 is only $74,629.[2]
The court also, as it has the liberty to do, rejects Flanagan's opinion that the property was worth $389,000. The court notes that Flanagan based his opinion in part on the defendant's own claim that the renovation project was "90% complete," which the court finds does not square with the facts. "The trier may accept or reject the testimony of an expert, offered by one party or the other, in whole or in part. (citations omitted) Ultimately, the determination of the value of real estate is a matter of opinion, which depends upon the considered judgment of the trial judge who takes into account the different opinions expressed by the various witnesses." Midway Green Corporation v. Board of Tax Review, 8 Conn. App. 440, 443
(1986). The court is privileged to adopt whatever testimony it deems to be credible. In this regard, the court has considered the factual testimony of the appraiser, the photographs and data in the appraisal report (Defendant's Exhibit 19), the many photographs of the premises introduced into evidence, the sales price in the unperformed real estate sales contract (Defendant's Exhibit 20), and its own general knowledge of the elements of value, and the court believes the railroad depot, together with the benefits of the parking lot agreement, has a value of at least $250,000.
A court is not obligated to select any one suggested opinion of value over any other. When confronted with conflicting evidence as to valuation a court may CT Page 741 properly conclude that under all of the circumstances a compromise figure most accurately reflects fair market value. New Haven Savings Bank v. West Haven Sound Development,190 Conn. 60, 70 (1983). "The determination of a property's value is the expression of the court's opinion aided ordinarily by the opinions of expert witnesses, and reached by weighing those opinions in the light of all the circumstances in evidence bearing upon value and its own general knowledge of the elements going to establish it." Eichman v. J. J. Building Co., 216 Conn. 443, 451 (1990).
In the event specific performance is decreed, plaintiff must pay the defendant $56,000 plus assume unpaid real estate taxes, liens and interest totalling (as of the time of trial) $70,000 as a sales price. When measured against a value of $250,000, at first blush, a reconveyance would appear to confer a windfall of approximately $180,000 upon the plaintiff. However, this is exactly what the contract anticipated, in the event of breach, . . . either the lesser of $56,000 or the then fair market value of the premises and improvements." Plaintiff's Exhibit C. (emphasis provided); and what the parties bargained for. If the rehabilitation was completed, the defendant could have had the benefits; if not, he regains the price. The purpose of the reconveyance clause was to ensure that the developer chosen would rehabilitate the property within a reasonable time, and if not, the plaintiff could regain the property. The clause also guarded against the possibility of the developer buying the property for speculation.
"Courts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled to sanctions of the law." Robert Lawrence Associates, Inc. v. DelVecchio, supra, 21-22.
Bearing in mind the proscription that it is not within [the] power [of the court] to make a new and different agreement; and that contracts fairly and voluntarily made should be held valid and enforced in the courts, Collins v. Sears, Roebuck Co., 164 Conn. 369, 375, 377 (1973); the court concludes that a decree of specific performance, without more, would potentially confer an undue benefit upon the plaintiff, to the great loss and detriment of the defendant and would be a forfeiture. The case at bar is CT Page 742 distinguishable from the rule in Robert Lawrence Associates, Inc., supra, and similar holdings, because while in those cases the enhancement in value of the property accrued through forces such as inflation, or as a result of the prospective buyer obtaining an advantageous zone change, here the court finds the enhancement resulted directly from the defendant's labor and materials.
"Despite the deference afforded by nineteenth-century courts to freedom of contracts in other areas, (citation omitted) clauses that might impose forfeitures were invariably carefully scrutinized and frequently denounced as penal. Vines v. Orchard Hills, Inc., 181 Conn. 501, 508
(1980).
The court's conclusion is based on these additional facts. Although the defendant was selected from a number of bidders for this redevelopment project, his relevant experience was limited to a small residential subdivision and a nightclub renovation. He had no demonstrated experience, let alone expertise, in the restoration of historic buildings, which the railroad depot was. He lacked organization, not only in the manner in which he tackled the job, but also in the preparation of a budget, a schedule of construction and in record keeping, as was amply demonstrated by the evidence. Although he had access to an attorney and an architect, he failed to seek appropriate assistance in a timely manner. At one point, instead of devoting his diminishing resources to work on the items necessary to substantially complete the restoration, he embarked on a tangential course of purchasing and installing tenants'* improvements when he decided that he was to be his own tenant. Although this was impractical and showed a lack of sophistication, his actions do not amount to a wilful breach.
At the same time, NCDC, which is comprised of many of the "movers and shakers" in the business and political community of Norwich, adopted an approach of benign neglect toward the project and exerted less than minimal effort to assist Arbucci in steering amid the shoals created by the Norwich municipal administrative agencies involved. Although the agreement did not impose a legal duty on the plaintiff to assist the defendant, it certainly had a vested interest in his success, when it selected him as a developer, and it certainly could have done more to help him achieve their CT Page 743 joint goal. The court also considers the actions of the city, which although not a party to the contract, was according to the evidence, vitally interested in redeveloping and rehabilitating its `blighted' central business district. Compare this with the astounding fact that neither the fire marshal nor the building inspector ever inspected the building during its restoration, nor offered assistance to the defendant; instead, the defendant was confronted with bureaucratic delays and denials, instead of compromise, guidance and assistance.
In this case, the court is confronted with the choice of denial of specific performance, thus frustrating the purpose of the contract executed about six years ago and further delaying development, and continuing the "blight," as the defendant has shown he is wholly incapable of properly rehabilitating the building.
On the other hand, by decreeing specific performance, the court would deprive the defendant of a substantial investment in time and money and may confer a substantial windfall on the plaintiff, which would be unconscionable under the circumstances of this case. If there is to be such a windfall in a reasonable time, it ought to be shared. Although as previously stated, the court believes that the value of the premises is $250,000, it is clear that it will take the plaintiff a substantial time to realize a profit, if any, from its sale. This is so because of the specialized nature of the building and the needed restoration yet to be completed. The project will also require a particularized buyer. Therefore, it would be inappropriate to order the plaintiff to pay any liquidated sum to the defendant at this time.
"In framing an order of specific performance . . . the trial court can mold it to do justice as fully as practicable. . . . If the exact performance promised is very difficult to enforce or has become impossible [or] unreasonably burdensome . . ., the court may order a performance not identical with what was promised." Sink v. Meadow Wood Country Estates, Inc., 18 Conn. App. 569, 578 (1989), cert. den. 212 Conn. 809 (1989), quoting E. Farnsworth, Contracts, (1982) (other citations omitted).
Accordingly, the court determines that the CT Page 744 balancing of the equities and what equity requires in this particular case, is that the contract of reconveyance be specifically performed under the following terms and conditions: The plaintiff shall pay the sum of $56,000 into court and assume all real estate taxes, liens and interest on the premises. The defendant shall execute and deliver to plaintiff a quit claim deed to the premises. In the event plaintiff resells or agrees to sell the premises within three years of the date title to the premises revests in it, the plaintiff shall pay over to the defendant one-third of its net profit on said sale, upon closing of title, after deduction of the reconveyance price of $56,000, its attorney's fees, all real estate taxes, interest, cost of insurance, maintenance, repairs, commissions, and all other expenses properly allocated to the ownership and sale of the premises. In the event no agreement to sell is obtained or the property is unsold by said date, for whatever reason, plaintiff's obligation to pay defendant one-third of said profit shall terminate absolutely. The sales price and other terms of the sale shall be at plaintiff's sole discretion.
The court finds support for this approach in Restatement of Contracts, Second, 358(1) which in part provides, "An order of specific performance . . . will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice requires. It need not be absolute in form and the performance that it requires need not be identical with that due under the contract," and Comment (a) which states in part: "The objective of the court in granting equitable relief is to do complete justice to the extent that this is feasible." The court finds further support for its conclusion in Restatement of Contracts, Second, 364(1)(b) which provides in pertinent part: "(i) Specific performance . . . will be refused if such relief would be unfair because . . . (b) the relief would cause unreasonable hardship or loss to the party in breach. . . ." See also Comment (a).
If a purchaser of real estate may, despite his breach, recover payments made to his seller, this court sees no reason why a breaching seller, under these circumstances ought not share in a profit, if any, gained by his buyer seeking specific performance. See Vines v. Orchard Hills, Inc., supra, 509, which states the proposition ". . . that courts of law may, on suitable occasions, afford equitable CT Page 745 relief from forfeiture." Id. This is such a case.
"The principles of equity evolved as a necessity in order to obtain justice because the law by reason of its universality was deficient. Equity in its true and genuine meaning is the soul and spirit of all law, and positive law is construed by it and rational law is made by it. In this, equity is synonymous with justice. Equity depends essentially upon the particular circumstances of each individual case. That being so, there can be no established rules and fixed principles laid down for its application, without destroying its very existence, and reducing it to positive law. The nature of equity is to amplify, enlarge, and add to the letter of the law and every particular case stands upon its own circumstances. Story's Equity Jurisprudence Vol. I, Ch. 1; Chitty's Blackstone, Bk. I, Sec. 1." (emphasis in original.) Natural Harmony, Inc. v. Normand, 211 Conn. 145, 150 (1989).
 IV.
As the plaintiff prevailed on its claim for specific performance, the court now turns to its claim for attorney's fees. The plaintiff presented an affidavit during trial (Plaintiff's Exhibit L), supplemented by a post-trial affidavit submitted with its brief claiming that it incurred reasonable attorney's fees in the amount of $25,069.
Courts have a general knowledge of what would be a reasonable attorney's fee which is fairly described and stated. See Appliances, Inc. v. Yost, 186 Conn. 673, 680
(1982). The court, after reviewing all of the pleadings, exhibits, the deposition received in evidence, the trial briefs and the trial itself, concludes that attorney's fees in the amount of $15,000 are fair and reasonable.
 V.
The first count of the defendant's counterclaim, which claims that the plaintiff acted in bad faith by impeding, obstructing or delaying various aspects of the renovation project is dismissed. There was simply no evidence produced by the defendant that the plaintiff impeded, obstructed or delayed (1) the driveway and parking lot paving or (2) the utility hookups or (3) the removal of CT Page 746 the diner, nor was there any evidence of bad faith or misconduct on the part of the plaintiff, other than benign neglect or inaction.
 VI.
The second count of the complaint is also dismissed, as the court does not find on the state of the record that a reconveyance of the premises, although the court believes it is worth $250,000, would presently unjustly enrich the plaintiff. To prove unjust enrichment, the party in breach, in this case the defendant, must prove that the innocent party's damages are less than the value of the benefit received by it. Here, there was no proof of the amount of damages sustained by the plaintiff as a result of the breach by the defendant and consequent delay in the completion of the building. Therefore, as the defendant has not satisfied his burden of proof that the plaintiff has sustained a net gain, the claim for unjust enrichment cannot be sustained. See Vines v. Orchard Hills, Inc., supra, 510. In any event, the court fashioned a remedy based on equitable principles.
 VII.
The plaintiff and the defendant Farmers and Mechanics Bank (F M) filed a signed stipulation dated October 7, 1992, providing for the disposition of funds in the event the plaintiff prevailed, as it did. However, the defendant Arbucci did not agree or sign it. As the defendant Arbucci may have off sets as to F M, the court declines the plaintiff's invitation to order disbursement of all the funds, and instead orders that F M's judgment liens shall attach to the net proceeds of the plaintiff's payment into court, after deduction of plaintiff's attorney's fees, taxable costs and the clerk's disbursement fees, and shall also attach to the "inchoate" net profit in the hands of the plaintiff, as set forth in Part III of this memorandum.
Accordingly:
(1) Judgment may enter on the complaint and counterclaim for the plaintiff, together with taxable costs; and a decree of specific performance shall enter that the defendant shall promptly execute and deliver a quit claim CT Page 747 deed to said premises forthwith to the plaintiff, free and clear of all encumbrances except real estate taxes and the Farmers and Mechanics Bank liens.
(2) The plaintiff shall prepare and deliver such deed to the defendant and deposit the sum of $56,000 with the clerk of this court.
(3) Judgment may also enter that the plaintiff, in the event of a resale or an executed agreement to resell is obtained within three years from the date title revests in the plaintiff, shall pay over to the defendant one-third of its net profit from this sale in the manner determined according to Part III of this memorandum.
(4) Attorney's fees are awarded to plaintiff in the amount of $15,000, which, together with taxable costs, may be deducted from the $56,000 deposit.
(5) In the event that defendant fails to execute and deliver the deed described in (1) above within thirty days hereof, then judgment shall enter vesting title in the plaintiff pursuant to the authority of General Statutes52-22 of the Connecticut General Statutes.
(6) Farmers and Mechanics Bank shall deliver releases of its judgment liens to the plaintiff promptly upon plaintiff's deposit of the net purchase price into court.
Teller, J.